$23,605,000. Thank you. Good morning, your honors. May it please the court. Edward Zast from the Federal Defenders of New York for Mr. Slaughter. Both the Constitution and the Jury Selection Act guarantee federal criminal defendants the fundamental right to a grand jury chosen from a fair cross-section of the community. Mr. Slaughter was denied that right. The government's own figures, using the government's own preferred statistical methodology, demonstrate an absolute disparity in the Manhattan Qualified Wheel of 9.88% for Hispanics. That's in the appendix at page 89, citing the affidavit from the government's expert. The district court correctly recognized that this extensive disparity is, in the court's words, substantially greater than the absolute disparities this court has permitted. In Biagi, for example, Judge Newman's opinion for the court declared that a disparity of 4.7% for Hispanics pressed the absolute numbers approach to its limit, and that the court would find the Sixth Amendment question extremely close if the underrepresentation had resulted from any circumstance less benign than use of voter registration lists. Can I ask one of the pressed-to-the-limit comment? It seems to me there's two different interpretations, and I'm sort of struggling with it. One would be this is close to the edge of what could be constitutionally permissible in terms of the disparity. And then the second is this is getting into a realm where this methodology is only marginally helpful because of the numbers involved. Do you have an interpretation? I take it as the first of the two that I said. I think it's certainly the first because of the comment that goes on to say that it would find the Sixth Amendment issue extremely close. Using that statistic, it's not a question of whether the numbers approach could be used. It's whether there'd be a violation. And I think what Judge Newman's opinion there was trying to do was to essentially send a warning signal out, like we're not reversing here, but if we see numbers like this either due to a cause that is less, quote, benign than just voter registration. Here it is voter registration, is it not? That's one of four causes that are extra. Which are the ones that are not benign? I'm sorry? Which are the ones that are not benign? Well, Your Honor, I think that Biagi's use of that term benign was actually ill-advised because Well, I don't know. Because, because Look, I Yeah. You're granting that using voter lists in the context of the case that you're talking about is benign. I said, if it's benign, what's the problem? And you said there are others that are not benign. And what are the others? And now you're saying we don't want to use the word benign. I'm just using your word, sir. No, no, I understand. And I didn't mean to. I'm not trying to avoid the question. I'm not saying any of these are not benign. In the sense, in the sense that none of these practices is intended to discriminate against any minority group, to cause any underrepresentation. I'm not sure whether intent is really the decisive point. Intent, intent. Is intent decisive? I don't think so. No, no, no. That's, that's why what I'm trying to say, if we step back, is many of the cases start to confuse or tangle two separate lines of constitutional doctrine. There is the Equal Protection Clause cases, where the question of whether a practice is benign is front and center. Because someone has to prove in that situation an intent or an animus, an intent to discriminate. And so benign practices, the use of benign versus non-benign, makes perfect sense in equal protection cases. But this is not an equal protection challenge. This is a fair cross-section challenge. And this Court has held, in Biagi itself, and later in Jackman again, that discriminatory intent is not an element of a fair cross-section challenge. So I'm conceding to you, Judge Jacobs. Yeah, that's just what I said. Well, I'm conceding to you. If you're asking whether we're alleging that any of these practices is being motivated by some bad purpose or animus, some intent to discriminate. I don't hear you making that argument. That's exactly right. Sure. We are not making that argument, and we are not requiring. And therefore you say engaging in a colloquy on whether it's benign or not doesn't advance the ball. Do I understand that right? That's right. I'm not saying it's completely irrelevant. Because you can imagine a case where there is intentional discrimination, and there is a disparity. And that might make it an extremely strong case of the next prong in Durham, which is systematic exclusion. But while it may be sufficient in some cases to have intent, it's not necessary. So then the question is how do we distinguish, I think, the cases that permit, let's assume as the district court did, assume we've got the statistical disparity. How do we distinguish the cases where it meets the third prong or not? And I'd like you to talk about what I understand to be a distinction between internal and external forces. And maybe that's what's being captured in benign. But we've got precedent, which does use that language about voter registration. And so why isn't this on each of the points that you've identified as causes? Why aren't those external and not internal? And do you agree that that's a relevant factor to analyze? Let me try to answer your question this way. First, the court's use of benign versus not benign in Biagi was going to the second prong of Durham about whether the underrepresentation was significant or not. And it suggested that whether the representation is significant depends on how benign or not the practice is. So we think that is wrong for the reasons I've already said, that the prong two of Durham is a question essentially about math. It's about statistics. You look at the numbers and you compare the numbers that you're getting about the jury pool compared to the population in the community. It's either significant or it's not. Prong three is different. And your question goes to prong three. That's the prong that requires the defendant to show that the disparity is caused or due to something systematic, which Durham tells us means something inherent in the jury selection process. Something that's part of the system, the way the system is choosing jurors. And what is it? Well, here, according to our expert, right, it's not just... Don't tell me what it isn't. What is it? What is the systematic... What's causing the disparity? Yes, yes, yes, yes. I didn't ask the question any other way. Yes, no, I just want to... You were saying it and I was saying, so what is it? No, I just want to make sure I understood your question, Your Honor. I'm sorry. It's not complicated. It's the four choices that we've identified. So, relying solely on voter registration rules, that's something that is part of the jury selection process. It's in the plan for the selection of jurors. No, it doesn't say only. It says you shall use voter registration rules. You said there were four and we've been talking about voter registration. Yes. So, what are the other three? The second is removing so-called inactive voters from the registration lists. So, that happens in the formation of the master wheel. That's two. Three is the decision to only update the wheel once every four years, which has recently been changed, but it doesn't pertain to this selection of this grand jury. And the fourth has to do with taking no steps to follow up on questionnaires that are not responded to at all or that come back as, quote, undeliverable. And what's the ground for thinking that these other three considerations, removing inactive voters, updating no more frequently than three years, and taking no steps to follow up has produced the disparity that you identified among Hispanic jurors? So, if we just take the decision to update only once every four years first, our expert says that that practice, because it's only done once every four years, results in several different features. One is that addresses of people become stale after four years for people who are moving, which our expert opined occurs more frequently with people in black and Hispanic populations. They tend to move more frequently. Is there a disparity among the black population? Within the black population? Yes. The 9.88% disparity you identified among Hispanic jurors, what is the disparity, if any, among black jurors? Yes. So the absolute disparity for the qualified wheel is? Whatever the 9.88 is, what is it for black jurors? Is that the 5.72? Is that the? It's 5.11% according to our expert, and 5.72% according to the government's expert. So can I just, and I know my colleague is going to want to go through the other ones, but on this one you've offered an explanation. Your expert has opined as to why that would be an explanation. The government has offered contrary data, and then the district court has evaluated that and ruled. What's your understanding? Clearly the question of what, I shouldn't say clearly, let's assume that the level of how big a disparity triggers concern under Step 2 of Duran is a legal question. But this determination of we have these competing experts giving us opinions and who are we going to credit, is that a factual determination with respect to which we owe deference to the district court, or are we reviewing de novo, and if de novo, why? So if there had been a determination on whether, on what the actual numbers were, so for example if Judge Fela had said I credit the whatever percent figure over the other one, that would be a factual finding that this court would review for clear error. She just didn't make that finding. She expressly declined to reach those questions. On the systemic exclusion issue, it's a little more complicated because there's sort of a mixed question of law and fact. So a factual aspect of that would be what's the cause and perhaps what's the impact of a particular practice in terms of causing the disparity. Right, and you presented evidence, and the government then presented its evidence, and at least as I read the district court's decision, they said we don't think you met your burden. I'm not persuaded by your evidence. The government says when we run the numbers on a two-year turnover, it actually turns out more favorable for the concerns that you're raising. So isn't that a factual determination, or what am I missing? No, no. What Judge Fela ruled was that none of the, if you will, two things, none of the four things that I've identified for Judge Jacobs and that we challenged were systemic. They were all external, quote, external forces. Now, whatever you think about the rest of the case, that's a legal error. It can't be that. Don't we have law that voter registration is external? I don't believe you do. If you do, I've missed it. But if you do respectfully, I think it's got to be wrong. So what is external in your view? The classic example of an external force would be, and these are the cases Judge Fela cited, hurricanes, weather events, acts of God, pandemic probably, some event that for a temporary period that's unforeseeable, it's outside the control of certainly the jury system and probably anyone else, that causes a disparity that clearly is external. But so let's take a hurricane. So let's say a hurricane causes lots of relocation. And the jury department persists in using the same method, even though the hurricane caused the disruption that leads to the disparity. I understand your position to be that that persistence over time, even if it was a hurricane that caused it in the first instance, would, I don't know how to think about it, internalize the external problem. It would make the jury department's continuation of that process in the face of systemic, in the face of persistent disparity systemic. Do I have that right? I think that's exactly right. And if I could step back just for a second. The Sixth Amendment, the Constitution, and the Jury Selection Act imposes an affirmative obligation on the government, in particular the people who design and administer the jury system. It's not like the Equal Protection Clause, which says, no state shall deny someone the equal protection of the laws, which is a prohibition on affirmatively bad state action. This is an absolute duty. So when the hurricane comes in year one, and whatever district, let's say there's a district that's predominantly African American or black, and that's causing that particular veneer for a couple of months, let's say, to be completely out of whack statistically, that would not be systematic. But take a different case. If statistics are showing year after year after year after year that there's a disparity among Hispanics, and it's become the subject of litigation, and courts are saying there's this disparity, and the government doesn't do anything. They don't make the change. Even though it's within their power to take steps to make the system fair and representative, that is systematic. That is now part of the jury system. And the statute itself builds in the idea that voter registration roles and reliance only on voter registration roles is not necessarily, certainly not external, because the statute directs that if the use of voter registration roles is not fulfilling the purposes of the fair cross-section requirement, then it mandates that other sources be included. And that's what the Eastern District of New York has done for years, and that's what the Western District of New York has done for years. But the Southern District of New York, in the face of all this data, hasn't done anything except the recent change from four years to two years, which may, we don't know until the data comes in, may help. But our point is this is not a hurricane. Whatever you may think of the statistics, these are things that the jury administrators can and must take action for. If the courts keep saying these are just personal choices or demographic changes, the jury administrator has no incentive. They view it as not their problem. In fact, maybe the most troubling thing in this case is the government's position on this appeal, where they just say we're aware of no case that says it's the jury system's duty to ensure fair and representative veneers. I think we, unless any of my colleagues have questions, I know we'll get to hear from you again in rebuttal. So thank you. Thank you so much. Ms. Sassoon. May it please the Court, my name is Danielle Sassoon, and I represent the United States on appeal. I want to start with prong two of the Duren test, because Slaughter failed to meet his burden under both prongs two and prongs three. And I think there's an important factual background that deserves clarifying here, which is with respect to the voter lists, the inactive voters, and the four-year interval, those claims all pertain to the master wheel.  The master wheel is 0.34% for blacks and 0.04% for Hispanics, which is well below the disparities that we saw for the SDNY plan in Biagi, and which this Court said failed to constitute constitutional under-representation. Can I press you a little bit on your framework? It was interesting to me. I completely understand that the master wheel numbers would be the numbers you would look to as you were evaluating the effect of using voter rolls and a different one might be different. I was interested in your suggestion that we conduct that analysis at step two, because it strikes me that step two is about the absolute numbers. And if I'm understanding what you're asking us to do is to say, well, the numbers insofar as this is the explanation are X and the numbers insofar as this is the explanation. And I guess I'm just trying to figure out why you don't have a perfectly great case that at step three you can't point to voter rolls because it doesn't reflect a disparity in the master wheel. But I don't understand how you break step two into little subparts for each reason. Well, I think with respect to the claims about the voter lists and evaluating whether it's systematic and whether it's causing underrepresentation, you have to look at the effect that it's actually having. And here you can see that this claim is not resulting in underrepresentation. You're saying it's evidence that the cause, they've identified four causes. One of them is voter registration lists. The lack of significant statistical disparity in the master list demonstrates that it's not a cause. And it shows that when we're evaluating the disparity in the qualified wheel, which is admittedly higher, what we need to be looking at is the failure to return questionnaires and not calling into question the use of voter lists, which Judge Nathan, you're correct that this court has said time and again that using voter registration lists is not constitutionally invalid unless there's some evidence. Let me press you precisely. Thank you. I couldn't recall the case names, but I can see where I'm at. It's in Biagi. It's in Young. It's in Miller. So let's say, and this really does get to prong three. I'm a little bit in the mindset of the district judge, who Skip assumed to. But let's say that the jury department learns on date X that the voter registration lists produces a statistically significant disparity. And that's true persistently over time. And doesn't do anything to alter that. There's no Sixth Amendment violation there at some point, given the failure to react to a persistent statistical disparity? Your Honor, Ryu recognized that statistics alone would not amount to a systematic exclusion unless it's at least of an overwhelmingly convincing nature. We don't have anything like that here. Right. So if you had a 10% disparity based solely on the voter rolls, is that a Sixth Amendment violation on year one? No, Your Honor. And that is not remotely of an overwhelmingly convincing. And how about on year 10? Again, if it's a 10% disparity, persistence alone is not going to amount to a constitutional violation. So if it's a 30% disparity on year one. Then we're talking about a different case that's worlds away from the case we have here, endurance. Welcome again to the nature of hypotheticals. Yes, but it's important to emphasize, Your Honor, because Judge Robinson, you pointed out the language in Biagi about approaching the outer limit. That was a master wheel case. And so with respect to the master wheel, when you're approaching a number like 5%, perhaps that is going to be more alarming than seeing a 10% disparity in the qualified wheel. But a 10% disparity as a result of voter registration lists, no matter the persistence of time, in your view, is not a Sixth Amendment problem. Yes, Your Honor. The 3rd, 5th, 7th, 10th, and 11th circuits have all recognized that a disparity of 10% does not amount to a prima facie case. And voter lists are the presumptive method of creating the jury wheel that's in the statute and in the Second Circuit case law. And when you're going from a master wheel to a qualified wheel, there is the prospect of ending up with percentages that don't perfectly mirror the population precisely because of external factors. What if your qualified wheel were solely voter registration lists? I'm just trying to press in the face of precedent. It's the persistence question. If at some point the failure to act in the face of whatever it is we agree is a statistically significant disparity internalizes the external. I mean, voter registration is who decides to register to vote, right? And this circuit has said, absent evidence, that a particular group has been hindered in its ability to register to vote, then it's constitutionally valid. So if you're seeing this persistent disparity resulting just from the voter rolls that might raise questions and a defendant could put in evidence that there's a group that's being hindered in its ability to register to vote, but absent that, a 10% disparity from an external factor, particularly one that this Court has repeatedly recognized is constitutionally valid, would not amount to a constitutional violation. When you say this Court has repeatedly recognized it's constitutionally valid, I'm struggling with the distinction between a factual determination that nobody has submitted sufficient evidence to suggest that the use of voter rolls drives the kind of dramatic disparities that we're arguably seeing here versus a conclusion that as a matter of law, it doesn't matter how much using the voter rolls drives disparities. Those are constitutionally unproblematic, even if we know that the use of voter rolls, and I'm not saying that this is the case as an evidentiary matter, but if the evidence was that that's going to create a 10% disparity right out of the blocks on the master wheel for certain minority communities, your position, I take it, is too bad, so sad. That's not a Sixth Amendment problem. Well, that's certainly not this case, and to your point about standard of review, I do think Judge Phelan's determination that Slaughter failed to meet his burden and put forth evidence that any of these factors he identified caused the disparity deserves deference. So you answered my legal question with a factual response, and that's why I'm trying to sort of cabin those two different concepts. By answering with a factual response, I think you implicitly concede that if the evidence did show substantial disparity over time as the result of use of voter rolls, that could be a constitutional problem. Voter rolls aren't somehow immune from constitutional scrutiny because they've never been shown so far to drive sufficient disparities. They're not immune, but if you look at the types of things that courts have concluded are systematic, they're very different. So, Durin, it was a non-facially neutral exemption that applied to one distinctive group, to women, in the Sixth Circuit case cited by— Okay, but that one is a great example, okay? So, in Durin, ultimately, it didn't prohibit women from participating, right? Ultimately, women chose whether or not they were going to respond and serve on juries. External. And that was their choice. It wasn't, Your Honor, because built into the jury selection plan was something that specifically applied only to one distinctive group, to women. No other group had this opt-out opportunity, which very clearly was going to result in a diminished percentage of women. In Jackman, it was a system that excluded entire counties that were predominantly minority populations. In the First Circuit case, it was a computer glitch that excluded particular counties. So, let me drive the hypothetical then to something closer to this. If the evidence—if challengers, or a defendant in this case, could marshal the evidence, and I'm not saying they have here, but that the differential response rates, which do seem to be a big driver here, are impacted by the manner in which the notices are sent and could be readily remedied by different notices. Perhaps, for example, including some Spanish language text in the notices. If they could show that that would actually drive up responses and create a qualified wheel that was more representative, I take it your position is they would have no constitutional obligation to explore that or do that, no matter how long those disparities endured. That's a more difficult case, and perhaps there comes a time where you approach a line, given the size of the disparity, being so overwhelmingly convincing, and the persistence of the disparity. But here, as you note, Your Honor, there was no evidence put forward that any additional steps with the questionnaires would have resulted in a smaller disparity. There is evidence that it's—I think it's your expert—that the response rate causes the disparity among the Hispanic population. And that falls well within what Ryu described as an external factor there. It was the failure to follow up. But you're saying in response to Judge Robinson, so you'd need that evidence plus evidence that there's an available cure that would make a difference. And then with—just, I think, to capture everything you said—a large enough disparity persistent enough over time, that might be a sufficient record. Well, Your Honor, it's important to keep in mind that you have prong two and prong three. So it's clear under the Dern factors that a disparity alone is not going to result in an unconstitutional plan, because in practice, it's going to be very difficult to get a qualified wheel that perfectly mirrors the population in the community because of individual choice, external factors. And that's why, when the Court has recognized a systematic exclusion, it has been things that are inherent to the selection plan itself, where the defendant can demonstrate that were conducted differently would yield a higher percentage. I want to touch on— So that seems like a good principle to distinguish this internal from external. The internal is if there's evidence of a way in which the system could be changed to eliminate the disparity that derives from a particular practice or failure of practice, then that might be considered internal. But if there's not evidence that can tie any actions by the jury department to the decisions that external people are making, then that's external. That's certainly one way to think about it. And I do think benign has a role to play here because, at least in some of the cases, the practice was clearly not benign. And that contributed to the fact that it was not just systematic, but a systematic exclusion, which is the language of the third prong in Duren. There's language in Duren that sounds to me like the persistence argument. It talks about the disparity being significant over time, which demonstrates systematicness. How do you think about that language? In Burgess, another Supreme Court decision, the language there suggests that hypothesizing things that might be contributing to a disparity that's persistent would not be enough. That was in a habeas posture, but it does indicate that persistence alone would be enough. There's also the Second Circuit case in Anderson, which says that a mathematical disparity alone is not going to be enough. So ignore that language in Duren because it seems to have been given little credence in future cases. I'm not aware of any case that has found a statistical disparity that's persistent alone amounting to systematic exclusion. And here, where our disparity is not of an overwhelmingly convincing nature. Again, we're talking about the qualified wheel, not the master wheel as in Biagi. And we're talking about a number that's below what a number of circuits have said does not make out a prima facie case of underrepresentation. We're not anywhere near that type of scenario. We also are in a situation where the persistence that's being talked about is a few years. And this district, the judges in this district, after all of these district courts have dismissed these types of claims, did adopt a new plan. And in that plan, which was also approved by the Judicial Council of the Second Circuit, the plan itself says we find that the use of voter lists is a method that achieves a fair cross-section of the community. I just want to note before I conclude for the court's awareness that Slaughter is in ICE custody awaiting deportation. And in the event that he is deported before any decision from this court, we will likely move to submit a supplemental letter or brief about why the appeal would then be moot. Hopeful. Thank you. Mr. Zoskow. Your Honor, the government invites you to affirm just on the second prong of Duren, which relying on the evidence that they're citing about what the master wheel consisted of, I just want to remind the court that Judge Fela, A, explicitly declined to resolve that issue. And on that issue, there was a classic case of competing experts. Although the government's expert said that there was no disparity or no substantial disparity in the master wheel, our expert said, in fact, that there was, caused by reliance on the voter registration rolls. And so I think it would be improper for this court in the first instance, given the competing experts, to make a finding of fact in the first instance about whether that, about what the numbers really are, and whether they qualify as significant under-representation. I think that's particularly true because both experts, there is no demographic data for the master wheel. So the statisticians had to try to estimate with a technique called geocoding, which is, although it's used a lot, could be challenged and is subject to error and only, even at its best, only gives you a general impression. Yeah, I was interested that I think your critique of the government's data about the disparity in the master wheel relied on the notion that, look, we know this geocoding is unreliable. Here's how we can test it against a qualified wheel to show how it's unreliable. But your own expert's assessment of the master wheel also relied on geocoding. So I just wasn't sure what to do with that. Well, I think that would be probably a great question on cross-examination of our expert if there were a hearing or a fact. But also, I think it's one thing for experts to agree that geocoding is a procedure that's used. But I think our expert, this is not on the record, but I think he would have attacked some of the underlying assumptions about, for example, which census tract do you use, which zip code, what does it really cover, are there other errors? So I just wanted to say that I don't think it would be appropriate for this court to make that controverted, to make a finding of fact on that controverted question. The government said that statistics alone can't show systematic exclusion. We totally agree. We've never argued that statistics alone can prove prong three. Statistics alone are about prong two. It's statistics to a certain degree over a substantial period of time when the cause is part of the system that makes it systematic. So I don't think that proposition really helps the government. The government noted there are cases that say that voter registration. So there is a question that I have as to whether, as just stated, prong three really just collapses into prong two if you have persistence. Because the final thing you said, which is caused by what we're looking at, any system, and I'll just read the language from Duran that I was referencing, his undisputed demonstration that a large discrepancy occurred not just occasionally but in every weekly veneer for a period of nearly a year manifestly indicates that the cause of the underrepresentation was systematic, that is, inherent in the particular jury selection process utilized. That's exactly the paragraph we highlighted in our brief. We think it supports us. Yes, I just want to make sure. I wasn't reading it to confront you with it. I'm reading it to ask the question. Yes, the court was saying that we've got evidence of this large discrepancy. It was almost a year. We're looking at, what, nine or ten years of data, but look at nine. It was manifestly apparent that that was systematic. So your view is statistics plus persistence tells you that it is the jury system that causes the disparity. Do I have that right? Yes, but we don't stop there, because we also introduced specific causes before I mentioned during my main argument. So we identified the cause. We didn't just throw up our hands and say, well, it must be something in the system that we can't identify. We've identified specific practices, and we've provided expert evidence. So when Judge Fela said that we failed to provide evidence about what was causing the underrepresentation, that's just an error. We put forth an expert who, under oath, said that, in his opinion, these practices are causing the underrepresentation. So that's just an error. Now, you might disagree about whether that's persuasive or whether it had a factual basis evaluated against the government, but she's just wrong that we didn't present the evidence. The government also, Judge Nathan, I don't want to miss this point. You asked earlier about whether the court had held that the use of voter registration rolls was external, and I didn't think of an answer, and the argument slightly changed when the government got up and they said that reliance on voter registration rolls is constitutional. So the point I want to make to you is that, first, of course there's nothing automatically or inherently unconstitutional about reliance on voter registration rolls. We're not objecting to that, and certainly it's a private choice of citizens about whether to register to vote. We're not saying that the jury system has to go out and get more people to vote, but the choice of people to vote is theirs, but the choice of what sourceless to rely on is the jury system's choice, and so I want to push back a little on this notion that something that's part of the system at one point is external and then becomes internal. Voter registration rolls from the get-go are an internal part of the system, and if there's evidence that reliance on those registration rolls alone is giving rise to substantial disparity, that is not an external feature. That's not a hurricane. That's a product of a human decision that could be changed and that must be changed under the Constitution and explicitly by statute. The government also said that there are cases outside the circuit that set a 10 percent floor that you can never show significant under-representation if the number's less than 10 percent. If you could just wrap it up, I think we have the argument well in hand. Yes, it's in our brief and in a very good law review article that the 10 percent number, if you trace it back, comes from the equal protection cases, where yes, sure, you need a higher number because you're trying to figure out if there's intentional discrimination. This is completely different. Thank you very much. I thank you all for your time. Appreciate it. Thank you both. Take it under advisement.